IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Estate of: | ) | No. 78932-5-I |
| | ) | |
| THOMAS R. GILLESPIE | ) | DIVISION ONE |
| | ) | |
| _____ | ) | |
| | ) | |
| THOMAS GILLESPIE and MARIE | ) | |
| GILLESPIE, and the marital community | ) | |
| composed thereof, | ) | |
| | ) | |
| Appellants, | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| VALERIE GILLESPIE, an individual and | ) | |
| co-personal representative of the ESTATE | ) | |
| OF THOMAS R. GILLESPIE, and | ) | |
| JAMES EECKHOUDT, an individual and | ) | |
| co-personal representative of the ESTATE | ) | |
| OF THOMAS R. GILLESPIE, | ) | |
| | ) | |
| Respondents. | ) | FILED: February 3, 2020 |
| | ) | |
| _____ | ) | |

ANDRUS, J. — Tom and Marie Gillespie, beneficiaries of the Estate of T.R. Gillespie (Estate), appeal a trial court order concluding that they triggered an *in terrorem* clause in T.R.'s Last Will and Testament (Will) and forfeited their right to any inheritance from the Estate when they commenced a lawsuit challenging the personal representatives' management of the Estate.

We affirm the trial court's conclusion that the current suit fell within the scope of the *in terrorem* clause, but conclude that res judicata bars the personal

representatives from relitigating whether the *in terrorem* clause contains a good faith exception. We also reverse the trial court's finding that Tom and Marie failed to bring the lawsuit in good faith because the court did not apply the correct standard in making this determination. The trial court should, in the first instance, determine whether Tom and Marie made a full and fair disclosure of all material facts to their counsel and brought this lawsuit on that legal advice. If Tom and Marie make this prima facie showing, they are entitled to a rebuttable presumption of good faith, and the burden shifts to Val and Jim to overcome this presumption with evidence of bad faith. We otherwise affirm the rulings of the trial court.

## FACTS

Thomas (T.R.) Gillespie died testate in 2011, and his Will was admitted to probate on July 14, 2011. At the time of his death, T.R. had two living children, Valerie (Val) and Thomas Jr. (Tom).[1] T.R.'s son, David, had predeceased him but was survived by his wife, Judy, and their children. T.R.'s estate included the estate of his wife, Marianne, who also had predeceased him (hereinafter collectively "Estate"). T.R.'s fourth and final codicil named Val and James (Jim) Eeckhoudt, Judy's brother, to serve as co-personal representatives. The Will contained an *in terrorem* clause, stating that any beneficiary who challenged the Will's probate forfeited his right to inherit from the Estate.

During their lifetimes, T.R. and Marianne created a number of trusts to hold various assets. The Gillespie Family Trust (Trust), created in 2000, named Val and Jim as co-trustees, and the beneficiaries of the Trust included every living

---

[1] Because the majority of the parties have the same last name, this opinion refers to them by their first names. We mean no disrespect.

descendant of T.R. and Marianne, as well as Judy, their deceased son's widow. Jim is neither a Trust beneficiary nor a beneficiary of T.R.'s Estate.

Around the same time, T.R. and Marianne formed Gillespie, LLC (the LLC), in which they each owned a 50 percent interest. In 2001, T.R. and Marianne conveyed the majority of their interest in the LLC to the Trust. As a result of this transfer, at the time of his death, T.R. held a 10 percent interest in the LLC, with the remaining 90 percent owned by the Trust. In return, the Trust agreed to pay T.R. and Marianne annual annuities until their deaths.

In November 2011, four months after Val and Jim opened the probate, John Andersen, Tom's then-attorney, e-mailed Charles Farrington, Val and Jim's attorney, a list of the Estate's assets. Andersen's list confirmed his understanding that the Estate owned a 10 percent interest in the LLC. In a separate e-mail on the same day, Andersen indicated to Farrington that the Trust had incurred a significant amount of debt, which could be alleviated by liquidating the LLC. Andersen sent Farrington his proposed liquidation plan, which reflected the Trust's receipt of 90 percent of the liquidation proceeds. In 2012, Val's personal attorney sent Andersen a Proposed Distribution Schedule for the Estate. This distribution schedule similarly indicated that the Estate would receive 10 percent of the liquidation proceeds.

In 2014, however, Tom and his wife, Marie, filed a petition in King County Superior Court seeking an accounting by Val and Jim, an inventory and appraisal of the Estate assets, and an order directing the Estate to pay the mortgage of an Idaho home in which Tom and Marie lived. Tom explicitly sought a judicial

declaration that T.R. had never effectively transferred any interest in the LLC to the Trust. He claimed that T.R. and Marianne maintained their full interest in the LLC until their deaths because the Trust failed to make the required annual annuity payments to them. Tom also challenged the Estate inventory that Val and Jim had prepared, claiming that assets identified as belonging to the Trust, including T.R.'s capital account in the LLC, were never properly transferred from the Estate and thus belonged to the Estate. Tom alleged that the LLC's 2011 tax return showed that T.R. "retained his entire original capital account in the LLC until his death." Consequently, Tom claimed that the entire LLC capital account belonged to the Estate and that the inventory designation showing a 10 percent ownership interest was erroneous.

Tom and Marie's claims proceeded to trial in September 2014 before now retired Judge Kimberly Prochnau. In her 34-page Findings of Fact, Conclusions of Law and Judgment (2014 Order), Judge Prochnau rejected the contention that the Estate held an interest in the LLC greater than 10 percent, and despite Tom's argument to the contrary, concluded that the Trust owned the remaining 90 percent interest. Judge Prochnau also found no breach of fiduciary duties by Val and Jim and denied the request for a forensic accounting. Judge Prochnau found that T.R. and Marianne had not paid taxes on the annuity income they had received from the Trust and authorized Val and Jim to withhold funds in the Estate to account for potential tax liabilities.

Judge Prochnau also concluded that Tom was barred, under the doctrines of waiver and laches, from challenging either the Trust's failure to make certain

annuity payments to T.R. and Marianne, or their transfer of a 90 percent interest in the LLC to the Trust. The court concluded that even though the record showed the payments had not been made as required, there was no evidence that T.R. requested payment or otherwise challenged a lack of payment. Judge Prochnau prohibited Tom from "trying to realign the assets in a manner which the various estate planning devices do not support."

Judge Prochnau also found that Tom had misled the probate court by filing a 2013 petition to probate the Will and misrepresented that he resided in the state of Washington, misstated that the Will appointed him as sole personal representative, and failed to identify himself as the largest debtor of the Estate, to which he owed $600,000. Judge Prochnau found that Tom owed the Estate $605,000, with interest accruing at 6 percent per annum, as of the date of trial, and she entered judgment against him in this amount. The court then credited Estate distributions owing to Tom from Marianne's Credit Shelter Trust toward this judgment, leaving a balance owed by Tom to the Estate of $261,557.86. Judge Prochnau ruled that additional cash advances made by the Estate to Tom and Marie would be deducted from the value of their respective shares in the final distributions made to them from the Estate.

As a result, Judge Prochnau ordered the personal representatives, Val and Jim, to distribute the 10 percent interest in the LLC to its three beneficiaries, Tom (2 percent), Marie (2 percent), and Val (6 percent). Before that could occur, Val was ordered to list for sale real estate the LLC owned in Hawaii and to distribute the net proceeds from the sale to the LLC.

Finally, Judge Prochnau also included a provision prohibiting Tom and Marie from suing Val and Jim again:

> All claims which Tom and/or Marie may have with regard to facts and circumstances known or reasonably known as of this date, now or at any time in the future, against either of the Estates, the Gillespie Family Trust, the Gillespie, LLC, or Cam Square, LLC, or against either of the Personal Representatives of T.R.'s and Marianne's Estates, Trustees and Managers of the LLCs are forever barred . . . .

Although Val and Jim sought to disinherit Tom and Marie under the *in terrorem* clause of the Will, arguing that the lawsuit they initiated fell within the scope of that clause, Judge Prochnau declined to do so, concluding:

> Article IX of TR's Will contained an in terrorem clause (Ex. 4) which provided that a beneficiary under such Will forfeits his or her interest in the Estate by becoming an adverse party in a proceeding for its probate. . . . A similar, but not identical, provision in a will was read broadly by our Court of Appeals to apply to requests to remove a PR. In re Kubick's Estate, 9 Wn. App. 413, 513 P.2d 76 (1973), rev. denied, 83 Wash.2d 1002 (1973) . . . . Although TR's in terrorem clause is similar in its breadth of coverage . . . , it differs from the Kubick will in that it does not explicitly except challenges made in good faith. Kubick noted, at least in dicta, that such a blanket prohibition might violate the policies inherent in RCW 11.28.020. . . . Given the specific statutory exceptions for good faith challenges and the policy concerns enunciated by Kubick and other cases, the court reads TR's will to except good faith challenges from the punitive aspects of the in terrorem clause.

Judge Prochnau found Tom and Marie had brought the lawsuit in good faith and thus had not triggered the *in terrorem* clause.

Tom and Marie were apparently not dissuaded from further litigation, despite the resounding defeat they suffered in 2014. In January 2016, John McGowan, an attorney in Idaho retained by Tom and Marie, sent Farrington a letter demanding information on the status of the LLC capital accounts, claiming

- 6 -

that Val and Jim had been withholding the LLC Schedule K-1s from 2012 through 2014 and as a result, the tax documents provided to Tom and Marie for their tax return did not explain why there had been a contribution to the LLC in excess of $2 million when there had been no distribution to the LLC members. McGowan demanded that Farrington provide the LLC tax information and delay any distributions from the LLC to the Trust and from the Trust to the beneficiaries.

In response, Farrington sent McGowan a copy of the 2014 Order and explained that the capital account adjustments reflected on the LLC documents were an effort to comply with the 2014 Order. He clearly stated that "[t]he capital account issue you reference was considered . . . and conclusively found by the Court to be inaccurate so your discussion of ownership, basis, capital accounts, and liquidating distributions of the Gillespie LLC is not supported by the Findings of Fact, Conclusions of Law and Judgment of the Superior Court."

Farrington arranged to have the Estate's K-1, Tom and Marie's individual K-1s, and the Estate's tax returns for 2012 through 2014 sent to McGowan, but he declined to delay any distributions, contending that Val and Jim had to make these distributions in order to comply with the 2014 Order. Farrington informed counsel that:

> [Y]ou are at least the ninth attorney to contact Val and Jim and their attorneys in this case over a period of five years. . . . We have provided extensive discovery and endured a 10-day trial. As each attorney retained by TJ has summarily dismissed TJ and/or Marie as their client, we have had to educate each new attorney as he/she/they appear in the case. Two of TJ's and Marie's former attorneys have filed attorney's fee liens against TJ's interest in the Estate of TR Gillespie. In addition, TJ owes the Estate of TR Gillespie in excess of $600,000.00. His current Washington attorney

is representing TJ and Marie in the pending attorney's fees motion relating back to the 2014 court decision.

Farrington also informed McGowan of the provision of the 2014 Order prohibiting Tom and Marie from suing Val and Jim again.

Despite previously facing the risk of losing their inheritance based on the *in terrorem* clause in the Will and being ordered not to sue Val and Jim based on facts known to them at the time of the 2014 trial, on February 29, 2016, Tom and Marie filed a new complaint against Val and Jim in a Blaine County, Idaho district court. They claimed that the LLC's 2014 tax return and a balance sheet provided to them in 2015 indicated a "transfer of capital" of approximately $2.5 million from the Estate to the Trust. They alleged that Val and Jim had breached their fiduciary duties by effectuating this capital transfer. Tom and Marie asked the Idaho court to order an accounting and to find that Val and Jim had breached their fiduciary duties by stating an intent to dissolve and liquidate the LLC without the members' consent. They once again alleged that the Estate should receive 100 percent of any proceeds generated by the liquidation of the LLC's assets. They also asked for a temporary restraining order to prevent Val and Jim from distributing the LLC's assets. On March 31, 2016, the Idaho court dismissed Jim from the lawsuit based on a lack of personal jurisdiction. Shortly thereafter, Tom and Marie dismissed the complaint against the remaining defendant, Val, without prejudice.

In July 2016, Val and Jim sent the Trust beneficiaries, including Tom and Marie, a letter informing them of their intent to liquidate the LLC. They informed the Trust beneficiaries that, as a result of the liquidation, $1,991,139 would be transferred to the Trust's capital account and that $467,387 would be transferred

to the Estate's capital account, consistent with their respective ownership interests. It is undisputed that Tom received this letter.

On September 28, 2017, Tom and Marie filed a new petition in King County Superior Court, seeking an accounting from the Estate. They alleged that any proceeds from the LLC's liquidation should be distributed in proportion to the members' capital account balances, rather than in proportion to their membership interests. Tom and Marie claimed that the Estate, not the Trust, should receive most, if not all, of the liquidation proceeds.

In response, Val and Jim, in their capacity as the executors of the Estate, argued that the 2014 Order barred these claims because Judge Prochnau explicitly found that the Estate owned only 10 percent of the LLC and it was entitled to receive only 10 percent of the LLC's liquidated assets. They also argued that the 2014 Order barred Tom and Marie from suing Val and Jim because their claims were based on facts known to them in 2014.

Tom and Marie subsequently amended this petition to assert direct claims of breach of fiduciary duty against Val and Jim individually. In their amended complaint, Tom and Marie alleged that Val and Jim made an unauthorized transfer of capital when they adjusted T.R.'s LLC capital account to reflect his 10 percent ownership, an action T.R. and Marianne had failed to take when the majority of their interest transferred to the Trust in 2001. Tom and Marie conceded that per the 2014 Order, the Estate owned only 10 percent of the LLC and the Trust owned the remaining 90 percent, but they argued that Judge Prochnau did not make findings or conclusions as to the associated capital accounts and did not explicitly

permit a transfer of capital to reflect the ownership interests. They argued that because Judge Prochnau had not made express findings as to the capital accounts, the Estate was entitled to all of the liquidation proceeds, which were in excess of $2.5 million.

In response, Val and Jim testified that they simply had complied with the 2014 Order and had repeatedly informed Tom and Marie of their intent to comply with the court's ownership determinations. They denied initiating any "transfer of capital;" instead, they testified they merely fixed an accounting error required by the 2014 Order. They also asserted that Tom and Maries' claims were barred by res judicata and/or collateral estoppel. Val and Jim asserted a counterclaim against Tom and Marie, seeking an application of the *in terrorem* clause.

Val and Jim then moved for summary judgment dismissal of Tom and Marie's claims, raising the collateral estoppel and res judicata defenses and asking the court to conclude that Tom and Marie had triggered the *in terrorem* clause by filing the lawsuit.

Tom and Marie filed a cross motion for partial summary judgment, claiming they were entitled to judgment as a matter of law because Val and Jim were unjustified in making a "transfer of capital" and that in doing so, they had unlawfully converted Estate assets and breached their fiduciary duties. They asserted that Judge Prochnau's determination that the Trust owned 90 percent of the membership interest in the LLC did not mean that the Trust also owned 90 percent of the company's capital. They contended that Val and Jim were barred by res judicata from arguing that the LLC capital accounting was erroneous.

On June 11, 2018, the trial court granted Val and Jim's summary judgment motion and denied Tom and Marie's motion. The order entered by the trial court contained detailed factual findings and legal conclusions. First, the court determined that the 2014 Order "required the Gillespie LLC to make an adjustment to capital and did not require Val & Jim as Managers of Gillespie, LLC to 'transfer' any capital, and certainly not in their capacity as Co-PRs." Second, it found no evidence that Val and Jim had transferred any capital from the Estate to the Trust. Finally, it found that Tom and Marie were attempting to relitigate the same claims they had previously alleged against Val and Jim by "asserting that Val and Jim acted improperly to carry out Judge Prochnau's trial orders." While the trial court concluded that the filing of the petition violated Judge Prochnau's order and dismissed all of Tom and Marie's claims, it reserved ruling and asked for supplemental briefing on whether Tom and Marie had triggered the *in terrorem* clause and forfeited their right to inherit from the Estate.

After further briefing from the parties, the trial court concluded that Tom and Marie had become adverse parties in the proceeding for the Will's probate and had thus triggered the *in terrorem* clause and forfeited their rights to the Estate. It further concluded, contrary to the legal ruling made by Judge Prochnau, that the *in terrorem* clause did not contain either a "safe harbor" provision or a good faith exception. It further found that "[t]he Plaintiffs have not acted in good faith and cannot avoid the invocation of this clause simply because they commenced this litigation with the advice of counsel." The trial court subsequently entered judgment of attorney fees and costs against Tom and Marie in the amount of

$53,635 and ordered that Tom and Marie must disgorge any and all partial distributions, debt offsets, advances on distributions, and income they had received from the Estate.

Tom and Marie moved for reconsideration, arguing that Judge Prochnau's legal ruling that there was a good faith exception to the *in terrorem* clause was binding on the parties through the doctrine of collateral estoppel. The trial court denied the reconsideration motion.

Tom and Marie appeal the trial court's ruling that their lawsuit triggered the *in terrorem* clause, the order that they disgorge any inheritance they had already received, and the assessment of attorney fees against them.

## STANDARD OF REVIEW

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Summary judgment is warranted only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. CR56(c). The facts and all reasonable inferences are viewed in the light most favorable to the nonmoving party. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989); Northgate Ventures LLC v. Geoffrey H. Garrett PLLC, __ Wn. App. ___, 450 P.3d 1210 (2019).

## ANALYSIS

1. Applicability of the *In Terrorem* Clause

Tom and Marie argue the trial court erred in concluding that the *in terrorem* clause applied to this case. They alternatively argue that even if this lawsuit invoked the clause, the trial court erred in failing to give preclusive effect to Judge

Prochnau's legal conclusion that the clause did not prohibit legal challenges made in good faith on the advice of counsel.

The *in terrorem* clause provides:

Should any beneficiary under this Last Will become an adverse party in a proceeding for its probate, such beneficiary shall forfeit his entire interest hereunder and such interest shall pass as part of the residue of my estate; . . . This Article shall not be construed to limit the appearance by any beneficiary as a witness in any proceeding for the probate of this Last Will, nor to limit his appearance in any capacity in a proceeding for its construction.

Tom and Marie argue that the clause applies only to challenges to the Will's validity and not to claims relating to the administration of the Estate by its personal representatives.

This court reviews the trial court's interpretation of a will de novo. In re Estate of Burks, 124 Wn. App. 327, 331, 100 P.3d 328 (2004). "The primary duty of a court when interpreting a will is to determine the intent of the testator." In re Estate of Niehenke, 117 Wn.2d 631, 639, 818 P.2d 1324 (1991). "Such intention must, if possible, be ascertained from the language of the will itself and the will must be considered in its entirety and effect must be given every part thereof." In re Estate of Bergau, 103 Wn.2d 431, 435, 693 P.2d 703 (1985).

The language of the clause provides that a beneficiary forfeits his or her interest if he or she becomes an "adverse party in a proceeding for [the Will's] probate." Nothing in the plain language of the clause limits its application to will contests.

Tom and Marie contend that the word "probate" means the court's act of deeming a will valid and "admitting" it as the legally binding instrument of the

- 13 -

testator's intent. The Will does not define the term "probate." Nor does chapter 11 RCW. In such case, the court may use a dictionary definition to discern the plain meaning on an undefined term. In re Estate of Petelle, 8 Wn. App.2d 714, 718, 440 P.3d 1026 (2019). At the time of the Will's execution, the term "probate" was defined as:

> [The] Court procedure by which a will is proved to be valid or invalid; though in current usage this term has been expanded to generally refer to the legal process wherein the estate of a decedent is administered. Generally, the probate process involves collecting a decedent's assets, liquidating liabilities, paying necessary taxes, and distributing property to heirs. These activities are carried out by the executor or administrator of the estate, usually under the supervision of the probate court or other court of appropriate jurisdiction.

BLACK'S LAW DICTIONARY 1202 (6th ed. 1990).[2] The dictionary definition demonstrates that the term "probate" has taken on a meaning beyond will contests to cover the administration of an estate.

The trial court did not err in concluding that Tom and Marie's lawsuit was an adversary proceeding relating to the probate of the Will. Their initial petition for an accounting invoked a probate statute, RCW 11.68.065.[3] This statute provides:

> A beneficiary whose interest in an estate has not been fully paid or distributed may petition the court for an order directing the personal representative to deliver a report of the affairs of the estate signed and verified by the personal representative. . . . Upon hearing of the petition after due notice as required in RCW 11.96A.110, the court may, for good cause shown, order the personal representative to deliver to the petitioner the report for any period not covered by a previous report.

---

[2] T.R. executed his Will in 1996. "A testator is presumed to have known the law in force when the will was drafted and to have drafted the will in conformity with that law. Consequently, if a will [is] ambiguous, the law when the instrument was drafted is a circumstance to consider in determining the testator's intent." McDonald v. Moore, 57 Wn. App. 778, 780, 790 P.2d 213 (1990).

[3] Chapter 11.68 RCW sets out procedures for the settlement of estates in probate without court intervention. The Will granted nonintervention powers to T.R.'s personal representatives, and as a result, the probate proceeded under chapter 11.68 RCW.

- 14 -

They sought a report because they contended that Val and Jim were refusing to provide information to them or to explain discrepancies they believed existed in the LLC and Trust tax documents. Their position was clearly adversarial in nature, and they were directly challenging the manner in which Val and Jim were administering the Estate.

Their position became even clearer in their amended complaint, in which Tom and Marie accused Val and Jim of breach of fiduciary duty and conversion. They alleged that Val and Jim had wrongfully appropriated Estate property by transferring that property to the Trust. Tom and Marie alleged that Val and Jim's actions were taken "in the course of [their] administration and probate of the Estate of T.R. Gillespie" and the administration of the Trust. Their 2017 claims were not materially different from the 2014 claims that would have triggered the *in terrorem* clause but for the implied good faith exception that Judge Prochnau concluded exists. Tom and Marie invoked the *in terrorem* clause when they brought this suit.[4]

Tom and Marie next argue that even if their suit triggered the *in terrorem* clause, the court erred in concluding that there is no good faith exception to the clause. They maintain that Judge Prochnau's contrary legal conclusion is binding and that Val and Jim are precluded from now arguing that no such exception exists. We agree.

---

[4] Although the clause permits a beneficiary to ask the court to interpret the Will without forfeiting his inheritance, we conclude that none of Tom and Marie's challenges concerned the construction of the Will. Their breach of fiduciary duty and conversion claims were direct attacks on Val and Jim's administration of the Estate. Thus, Tom and Marie's claims did not fall under the exception to the clause.

Whether res judicata bars an action is a question of law and is subject to a de novo review. Ensley v. Pitcher, 152 Wn. App. 891, 899, 222 P.3d 99 (2009). "The doctrine of *res judicata* rests upon the ground that a matter which has been litigated, or on which there has been an opportunity to litigate, in a former action in a court of competent jurisdiction, should not be permitted to be litigated again." Id. (internal quotation marks omitted) (quoting Marino Prop. Co. v. Port Comm'rs of Port of Seattle, 97 Wn.2d 307, 312, 644 P.2d 1181 (1982)). "The threshold requirement of res judicata is a valid and final judgment on the merits in a prior suit." Id.

Judge Prochnau decided that under Estate of Kubick, 9 Wn. App. 413, 419, 513 P.2d 76 (1973), the lack of a good faith exception in an *in terrorem* clause might violate the policies inherent in RCW 11.28.020. Consequently, in the 2014 Order, Judge Prochnau concluded that "Given the specific statutory exceptions for good faith challenges and the policy concerns enunciated by Kubick and other cases, the court reads TR's Will to except good faith challenges from the punitive aspects of the in terrorem clause."

Val and Jim argue that the public policy discussion in Kubick is dicta and not the holding of the case. But that argument could have been made to Judge Prochnau, who ultimately concluded that the clause contained such an exception. Even if Judge Prochnau erred in concluding that there was a good faith exception to the *in terrorem* clause of the Will, Val and Jim did not appeal this legal conclusion and it became final and binding on the parties. The court erred in concluding

otherwise. Val and Jim are barred under the doctrine of res judicata from now asserting the absence of such an exception to the Will.

Tom and Marie next challenge the trial court's finding that they did not act in good faith in initiating this lawsuit. They contend that they are entitled to the conclusive presumption that they acted in good faith because they brought the lawsuit on the advice of fully informed counsel. We conclude that the party challenging the application of an *in terrorem* clause bears the burden of proving they initiated a lawsuit in good faith and on the advice of fully informed counsel. Once a petitioner has made a prima facie showing, there is a rebuttable presumption of good faith which the opposing party may overcome with evidence of the intentional violation of a court order, dishonesty, improper or sinister motive, the lack of any factual basis for the asserted claims, or the intentional withholding of material factual information from counsel. Because the trial court did not apply the correct standard, we reverse for entry of findings of fact in light of the test set out here.

In Kubick, this court adopted a presumption of good faith in the context of the applicability of an *in terrorem* clause, but it did not explicitly indicate whether the presumption was conclusive or rebuttable.[5] In that case, the decedent's daughter, Mary Lou Cathersal, sought to remove the executor of her father's estate. 9 Wn. App. at 414. The guardian ad litem, acting on behalf of the other

---

[5] A "conclusive presumption," or an "irrebuttable presumption," "cannot be overcome by any additional evidence or argument because it is accepted as irrefutable proof that establishes a fact beyond dispute." BLACK'S LAW DICTIONARY 1435 (11th ed. 2019). A "rebuttable presumption," on the other hand, is "drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence." BLACK'S LAW DICTIONARY 1436 (11th ed. 2019).

beneficiaries, argued that Cathersal's petition triggered the *in terrorem* clause in Kubick's will and that Cathersal's lawsuit had not been initiated in good faith. Id. At trial, the court dismissed Cathersal's case at the close of her case-in-chief but rejected the guardian's argument that Cathersal had forfeited her inheritance. Id. at 417. The court reasoned that Cathersal brought the case in good faith because she had consulted with an attorney before filing it. Id.

This court reversed the trial court's good faith finding. Id. at 419-20. Although the court noted that a suit brought on the advice of counsel is "persuasive of the bona fides of the suit," it could not determine whether Cathersal's suit had been brought in good faith because the guardian had not been afforded the opportunity to establish what facts were before counsel when counsel provided advice to Cathersal. Id. at 420.

The court stated, in dicta, that "if Mrs. Cathersal laid the facts fully and fairly before her attorney and acted on his advice in bringing the action, she must be deemed to have acted 'in good faith and for probable cause' as a matter of law." Id. And it did not set out a test for determining whether a petitioner had laid the facts "fully and fairly" before her attorney. The court remanded the matter to allow the petitioner to demonstrate that she had fully informed her counsel and to give the guardian the opportunity to present conflicting evidence. Id. at 420-21.

In Estate of Mumby, 97 Wn. App. 385, 387, 982 P.2d 1219 (1999), Darlene Wood petitioned to invalidate her deceased father's living trust on the grounds that the executor and beneficiary had exerted undue influence over him before his death. Id. at 388. The executor counterclaimed that the no-contest provision in

Mumby's will barred Wood from inheriting. Id. The trial court enforced the clause against Wood. Id. at 391. On appeal, Wood contended that because she consulted an attorney before filing suit, "she must be deemed to have acted in good faith." Id. at 393-94. The Mumby court determined that the record supported the trial court's conclusion that Wood had not fully and fairly disclosed all material facts to counsel. Id. at 394. As a result, it concluded Wood was not entitled to a presumption of good faith. Id.

The court then went on to analyze whether, in the absence of such a presumption, the trial court properly found that Wood acted in bad faith. Id. It defined "bad faith" as "actual or constructive fraud" or "neglect or refusal to fulfill some duty," or an act "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Id. (internal quotation marks omitted) (quoting Bentzen v. Demmons, 68 Wn. App. 339, 349 n.8, 842 P.2d 1015 (1993)). It affirmed the trial court's finding of bad faith because the record supported the conclusion that all independent witnesses testified that Wood's father was competent and exercised his own judgment until his death and his expressed intent was consistent from the date of his will to the date of his death. Id. at 395. In other words, there was no evidence to support any of Wood's allegations.

These cases suggest that any presumption of good faith that may arise after a litigant consults counsel may be rebutted by the party seeking to enforce an *in terrorem* or no-contest clause. The Kubick court hinted that any presumption of good faith is rebuttable by allowing the guardian to challenge the completeness or

fairness of the opposing party's disclosure to counsel. See 9 Wn. App. at 417. Similarly, in Mumby, the court rejected the argument that simply consulting with an attorney is sufficient to show good faith. Mumby, 97 Wn. App. at 394. Even though Wood's attorney in Mumby submitted a declaration to the court saying he was fully informed, the court identified several key facts that Wood had not disclosed to her counsel. Id.

In this case, Tom and Marie presented declarations from their attorneys, Christopher Wright and Kenneth Hart, who testified they were provided "all of the information and the limited documentation they had available to them concerning the transfer of capital between the members of the LLC," including the LLC's 2014 tax return, the 2014 Order, and the LLC's Operating Agreement. They concluded that they could not understand what had happened with the LLC's capital accounts. They retained a CPA expert, Gregory Porter, who consulted with them regarding capital accounting for LLCs and calculating "the magnitude of the loss to the Estate" when the capital account adjustment occurred. They advised Tom and Marie to bring the lawsuit.

The record before this court, however, lacks any declaration from Tom or Marie detailing what information they shared with their attorneys before they brought this lawsuit. And Charles Farrington, probate counsel for the personal representatives, testified that he repeatedly provided extensive documentation and explanations to Tom and Marie's attorneys to be transparent about what had occurred and why.

Val and Jim also presented evidence that Tom and Marie brought this lawsuit based on factual information known to them at the time of the 2014 trial, arguing that they violated the court's order prohibiting them from suing Val or Jim again. They also presented evidence that Tom and Marie had changed attorneys repeatedly and forum-shopped in an attempt to avoid the adverse consequences of the 2014 Order, despite knowing that they faced the risk that the *in terrorem* clause could be triggered. Farrington testified that every time Tom and Marie retain new counsel, he had to educate their new attorneys regarding the history of the litigation between the parties.

Additionally, Val and Jim presented evidence that the language of the LLC's Operating Agreement explicitly required them to make the capital account adjustment the Estate's CPA recommended that they make. Paragraph 8.5.3 of the LLC Operating Agreement provided:

> **Transfer of Capital Accounts.** Except as otherwise required by law, if any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred Membership Interest.

The trial court concluded that this language was legally dispositive of any claim that Val and Jim had made an improper asset transfer:

> 46. On lines 2b and 6b of Schedule M-2, the post-trial 2014 Gillespie, LLC 1065 Partnership Tax Return reported that Gillespie, LLC made a capital adjustment in the amount of $2,492,188 that year.
>
> 47. Such amount was simply a shift in the capital balance from one member (TR Estate) to another member (the Gillespie Family Trust).
>
> 48. No property or money changed hands as part of that $2,492,188; it was simply a paper transfer to match the capital accounts with support documents that occurred on 6/26/14.

. . . .

50. These capital adjustments were due to a change in ownership in a previous year that was not recorded properly in the year of the transaction. FOF 55; COL 3; Exh. A to Thomas J. Gillespie declaration, §8.5 and 8.5.3 (LLC Oper. Agmt.).

Val and Jim further presented evidence from Kenneth Pierce, the CPA who had prepared the LLC's tax returns from 2014 to 2017. He confirmed that when he became aware of the Trust's purchase of a capital interest in the LLC, it became apparent to him that the transfer had not been properly reflected in the capital accounts of the LLC members. He explained how the purchase of another member's ownership interest can affect an LLC member's capital account: "When a buyer purchases an [LLC] ownership interest for cash, it generally results in the transfer of the seller's capital account to the buyer." But T.R. and Marianne failed to have the LLC tax returns properly reflect the capital account transfers when they transferred their membership interest to the Trust in 2001. He stated:

> 13 years after the transaction occurred, Defendants Valerie Gillespie and James Eeckhoudt properly corrected this omission via a capital adjustment which they made, and properly reflected such adjustment in the 2014 tax return of the Gillespie LLC.

> The capital account adjustments made via the 2014 Gillespie LLC tax return did not affect the value of the underlying assets of the LLC.

Farrington also testified that the adjustment of the capital on the tax return did not affect the value of the Estate's interest in the LLC, a value to which Tom and his attorney had agreed as early as 2011.

Based on this record, we conclude the trial court should, in the first instance, determine whether Tom and Marie made a full and fair disclosure of all material facts to their counsel and brought this lawsuit on their advice. If the trial court

- 22 -

determines that Tom and Marie have made this prima facie showing, they are entitled to a rebuttable presumption of good faith, and the trial court should then determine if Val and Jim have overcome this presumption with evidence of bad faith—for example, evidence of the intentional violation of a court order, dishonesty, improper or sinister motive, the failure to have a factual basis for the asserted claims, or the intentional withholding of material factual information from counsel.[6]

## 2. Res judicata

Tom and Marie finally contend that the trial court erred in making extensive findings of fact in the order granting summary judgment. But the court dismissed Tom and Marie's claims based on the doctrine of res judicata. The standard of review of the application of res judicata is de novo. Lynn v. Dep't of Labor & Indus., 130 Wn. App. 829, 834 n.7, 125 P.3d 202 (2005). Thus, any findings of fact are superfluous and are disregarded on appeal. Redding v. Virginia Mason Med. Ctr., 75 Wn. App. 424, 426, 878 P.2d 483 (1994). Because our review is de novo, it is immaterial that the trial court "found" that Tom and Marie sought to relitigate claims that Judge Prochnau resolved in her 2014 Order.[7]

---

[6] The resolution of disputed facts as to Tom and Marie's good faith does not require an evidentiary hearing and may be based on affidavits. Tom and Marie's complaint was brought under the Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW. Under TEDRA, a court may resolve any and all disputed issues of fact through affidavits; there is no requirement for it to hold any evidentiary hearings. RCW 11.96A.100(7); Foster v. Gilliam, 165 Wn. App. 33, 55, 268 P.3d 945 (2011) (under TEDRA, court need not hear oral testimony to make findings).

[7] The only other findings of fact that Tom and Marie challenge are paragraph 55, in which the court found that "Val and Jim have not transferred any capital," and paragraph 75, in which the court found that "Val & Jim have incurred significant attorney's fees and costs in defending" the claims in this suit. But they point to no evidence to demonstrate that Val and Jim did transfer any assets from the Estate to the Trust. And the finding in paragraph 75 was not a material issue of fact on summary judgment.

Tom and Marie contend their claims are not barred by res judicata or collateral estoppel because they were based on actions Val and Jim took in correcting the LLC capital accounts after the entry of the 2014 Order. But this characterization of their claims is superficial and misstates the relief they actually sought here. Tom alleged in 2014 that T.R.'s 100 percent ownership interest in the LLC "is reflected in the 2011 tax return of Gillespie LLC, which shows that [T.R.] retained his entire original capital account in the LLC until his death." In other words, Tom relied on the value of T.R.'s LLC capital account as reflected in the LLC tax returns as proof of the value of T.R.'s membership interest in the LLC. Judge Prochnau explicitly rejected this claim:

> 58. Tom argues, alternatively, that TR's estate should be allocated 100% of the proceeds from liquidation of the Gillespie LLC assets because . . . the tax returns and K-1s appear to indicate that the Gillespie LLC assets were still titled and in the control of TR or his estate. . . .

> 59. While the tax returns prepared at the direction of TR are of some interest, they were generally prepared by CPAs in the State of Hawaii who did not testify nor was it shown that they were conversant with TR's estate planning or working with TR's estate planning attorneys. The returns provide insufficient evidence to demonstrate that the court should (1) disregard the various entitles, (2) look behind the entities' legal framework and attempt to unwind the various transactions or (3) determine whether the various entities received their appropriate share of the assets during TR's lifetime.

The only conclusion one can draw from the argument Tom advanced in 2014 and this finding of fact is that the capital account reporting in the LLC tax returns were unreliable evidence of the Estate's ownership interest in the LLC. Judge Prochnau refused to credit the Estate with more than a 10 percent ownership interest in the LLC because to do otherwise would be contrary to T.R.'s intent.

Despite these findings, Tom and Marie alleged in their 2018 complaint:

> 2.7 Neither Washington law, nor any generally accepted account[ing] principal, nor any provision of the Operating Agreement of Gillespie LLC required that each member's percentage share of the total of the capital accounts of all members of the LLC match the member's percentage ownership of the units of the LLC, or prohibit a member from owning a larger percentage of the total of the capital accounts of all members than the member's percentage ownership of the LLC.
>
> . . . .
>
> 2.11 While the capital account balances of the members of Gillespie LLC were known at the time of trial to be disproportionate to each member's ownership interest in the LLC, Judge Prochnau made no findings or conclusions regarding the capital account balance of the Estate and did not enter any judgment regarding adjustments or modifications to the existing capital accounts of the Estate and the Trust as reflected in the company's records and contemporaneous tax filings.

Tom and Marie's contention that the Estate's 10 percent ownership interest can exceed in value the Trust's 90 percent ownership interest and should reflect the values attributed in the admittedly incorrect LLC tax filings is an argument that could have been litigated in 2014. While they point to Val and Jim's post-trial administrative activities in correcting the LLC tax returns as the basis for their claims, the claims are premised on legal and factual contentions that were at issue in the 2014 trial. While Judge Prochnau did not explicitly rule that the Estate's capital account balance had to reflect in value the membership percentage interest, Tom and Marie certainly could have asked for such a ruling.

Res judicata bars not just the relitigation of claims or issues that were litigated, but also the litigation of claims or issues that "might have been litigated, in a prior action." Loveridge v. Fred Meyer, Inc., 125 Wn.2d 759, 763, 887 P.2d 898 (1995). For the doctrine to apply, a prior judgement must have concurrence

of identity in (1) subject matter, (2) cause of action, (3) persons and parties, and (4) the quality of the persons for or against whom the claim is made. Id.

There is a final and binding judgment between Tom and Marie, as beneficiaries, and Val and Jim, as personal representatives, of the Estate. The causes of action in 2014 are identical to the causes of action here: a request for an accounting by the personal representatives and breach of fiduciary duty. The legal and factual issues on which the current claims are based are identical to the legal and factual issues that were the subject of the 2014 litigation and which could have been fully litigated then. Thus, the trial court did not err in granting summary judgment based on res judicata.

3.    Attorney fees on summary judgment

Finally, Tom and Marie challenge the July 31, 2018 order awarding attorney fees to Val and Jim.[8] Although Tom and Marie assigned error to the award of fees, they did not brief the issue. We thus decline to address this issue. See Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (appellate court will not consider inadequately briefed argument).

4.    Attorney fees on appeal

Val and Jim request an award of attorney fees on appeal under RCW 11.96A.150. We refer this request for the trial court to decide on remand after determining whether Tom and Marie brought this lawsuit in good faith.

---

[8] Val and Jim sought and received an award of attorney fees and costs under RCW 11.96A.150 which provides:

(1) Either the superior court or any court on an appeal may, in its discretion, order costs, including attorneys' fees, to be awarded to any party . . . that is the subject of the proceedings.

- 26 -

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

WE CONCUR: